# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 14, 2010               Decided June 17, 2011

No. 09-1050

NATIONAL MARITIME SAFETY ASSOCIATION,
PETITIONER

v.

OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION AND
SECRETARY OF LABOR,
RESPONDENTS

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,
AFL-CIO,
INTERVENOR

On Petition for Review of a Final Rule
of the Occupational Safety & Health Administration

*Francis Edwin Froelich* argued the cause for the petitioner.

*Edmund C. Baird*, Attorney, United States Department of Labor, argued the cause for the respondents. *Deborah Greenfield*, Acting Deputy Solicitor, *Joseph M. Woodward*, Associate Solicitor, and *Charles F. James*, Counsel, were on brief.

*Christine S. Hwang*, *Elizabeth Morris* and *Randy S. Rabinowitz* were on brief for the intervenor.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: On December 10, 2008, the Occupational Safety and Health Administration (OSHA), an agency of the United States Department of Labor, published a final rule regulating vertical tandem lifts (VTLs). Longshoring and Marine Terminals; Vertical Tandem Lifts, 73 Fed. Reg. 75,246 (VTL Standard or Standard). The National Maritime Safety Association (NMSA), a trade association representing marine terminal operators, petitions for review of the VTL Standard and argues (1) OSHA failed to demonstrate that VTLs pose a significant risk to worker safety; (2) two of the Standard's requirements are not technologically feasible; (3) the Standard is not reasonably necessary or appropriate in light of the "safe work zone" requirement; (4) OSHA's authority is limited to requiring, not prohibiting, workplace practices; and (5) if the Standard is otherwise valid, the Occupational Safety and Health Act (OSH Act or Act), 29 U.S.C. §§ 651-678, has made an unconstitutional delegation of legislative power to OSHA. As explained below, we grant the NMSA's petition but only in part, vacating and remanding the Standard with respect to the inspection requirement for ship-to-shore VTLs, 29 C.F.R. § 1917.71(i)(9), and the total ban on platform container VTLs, *id.* § 1917.71(i)(10). Otherwise, we deny the petition.

**I.**

Most maritime cargo today is shipped in standardized intermodal containers that can be transferred from ship to shore (thence to rail, and/or truck and, finally, to warehouse) in the same container. The container has openings at each corner that allow it to be secured onboard a ship, truck or train. Containers are frequently vertically stacked on top of one another for transport, in which case interbox connectors can be inserted into

the corner openings to fasten the stacked containers to each other. Standard containers are shaped like rectangular boxes. Platform containers (also called flat racks) have no top or long sides and the end panels (or short sides) are either fixed upright or can be folded flat onto the floor of the container. Platform containers may also be attached to other containers using interbox connectors, typically with their end panels folded flat. A crane can lift the interconnected containers in what is called a vertical tandem lift and thereby move multiple containers at once. Marine cargo handlers have been performing VTLs for over twenty years. While the total number of VTLs performed is unknown, OSHA has estimated the number to be one million VTLs since 1986. No injury has been reported as having occurred during a VTL.

In 1986 OSHA asked Matson Terminals, Inc. (Matson), a shipping company then using VTLs, for information regarding the strength and integrity of Matson's containers and interlock connectors. Matson supplied the requested information and additionally sought OSHA's permission to lift two interconnected containers, either empty or with one or both containers holding automobiles. VTL Standard, 73 Fed. Reg. at 75,247. At the time, OSHA regulations did not directly address VTLs but provided that "all hoisting of containers shall be by means which will safely do so without probable damage to the container, and using the lifting fittings provided." 29 C.F.R. § 1918.85(c) (1986) (quoted in 73 Fed. Reg. at 75,247). OSHA granted Matson permission to perform the requested lifts but cautioned Matson to "be mindful of the manufacturer's specifications and endorsements, the Matson engineering technical specifications" and the condition of the equipment. 73 Fed. Reg. at 75,247. In 1993, Sea-Land Service, Inc. (Sea-Land), another shipper, requested OSHA's permission to lift two empty, interconnected containers in a VTL. *Id.* In a response letter that has come to be known as the "Gurnham letter," OSHA

permitted Sea-Land to perform VTLs of two empty containers if Sea-Land met the following eight requirements:

> inspect[] containers for visible defects; verify[] that both containers are empty; assur[e] that containers are properly marked; assur[e] that all the [interbox connectors] operate (lock-unlock) in the same manner and have positive, verifiable locking systems; assur[e] that the load does not exceed the capacity of the crane; assur[e] that the containers are lifted vertically; hav[e] available for inspection manufacturers' documents that verify the capacities of the [interbox connectors] and corner [openings]; and direct[] employees to stay clear of the lifting area.

*Id.* In 1994 OSHA briefly mentioned VTLs in the preamble to its proposed revisions to the Longshoring and Marine Terminals Standards, 59 Fed. Reg. 28,594, 28,602 (June 2, 1994), but "[b]ecause of a lack of information on the safety considerations, cost impacts, and productivity effects of VTLs, as well as on the capability of containers and [interbox connectors] to withstand such loading, OSHA reserved judgment on the appropriate regulatory approach to [VTLs], pending further study." VTL Standard, 73 Fed. Reg. at 75,247 (citing 62 Fed. Reg. 40,142, 40,152 (July 25, 1997)). OSHA nevertheless reopened the record with respect to VTLs several months later, requesting comments and scheduling an "informal public meeting" to gather information about VTLs. 62 Fed. Reg. 52,671, 52,672 (Oct. 9, 1997). After the public meeting, OSHA contracted with the National Institute of Standards and Technology, an agency of the U.S. Department of Commerce that conducts physical science research, to conduct engineering studies on the strength and durability of container interconnection points and interbox connectors. OSHA also met with several international standard-setting organizations to discuss VTL standards and formed a "workgroup" within its Maritime Advisory Committee for

Occupational Safety and Health (MACOSH) to study VTLs and report back to MACOSH. VTL Standard, 73 Fed. Reg. at 75,248.

In 2000, the International Organization for Standardization (ISO)—"a worldwide federation of national standards bodies whose mission is to promote the development of international standards to reduce technical barriers to trade," 73 Fed. Reg. at 75,246—agreed that interbox connectors could be used to vertically lift up to three containers (depending on the strength of the containers and interbox connectors) and requested ICHCA International Ltd. (ICHCA),[1] an ISO member, to develop a single, comprehensive document dealing with all aspects of VTL operations. *Id.* at 75,248; ICHCA, Vertical Tandem Lifting of Freight Containers § 1.6. Two years later, the ISO formally adopted a standard permitting VTLs under certain conditions, ISO 3874 § 6.2.5; 73 Fed. Reg. at 75,248, and ICHCA published its comprehensive VTL standard in 2003, ICHCA Int'l Ltd., Vertical Tandem Lifting of Freight Containers (ICHCA Standard) (2003); 73 Fed. Reg. at 75,249. The ISO standard permits VTLs of up to three containers if the total mass of the VTL unit does not exceed 20,000 kilograms (kg), or 20 metric tons,[2] the interbox connectors have a safe

---

[1] ICHCA describes itself as "an independent, non-political international membership organi[z]ation, whose membership comprises corporations, individuals[ and] academic institutions . . . involved in . . . the international transport and cargo handling industry." ICHCA Int'l Safety Panel Technical/Operational Advice No. 1, Vertical Tandem Lifting of Freight Containers (2003).

[2] One metric ton equals 1000 kilograms or approximately 2200 pounds. Webster's Third New Int'l Dictionary 1424 (1993).

working load[3] of at least 10,000 kg and the vertical force exerted on each corner connection does not exceed 75 kilonewtons (kN).[4] ICHCA Standard §§ 5.1.4, 5.1.7. The ISO uses a safety factor of five in assessing the safety of VTLs.[5] *Id.* § 5.1.6. The ICHCA standard imposes the same mass and safety factor requirements and, in addition, prohibits using VTLs of platform containers unless the end panels are folded flat. *Id.* §§ 8.1.2.3, 8.1.2.5, 8.1.3.1.2, 8.1.3.2.1. An empty box container weighs between approximately 5000 and 10,000 pounds, depending on the size of the container, which equates to a mass between approximately 2300 kg and 4600 kg. A two-container VTL of the largest containers has a mass of 9200 kg and a three-container VTL, a mass of 13,800 kg. The ISO and ICHCA standards, thus, permit loaded containers to be lifted in a VTL if the total cargo in a two-container VTL does not exceed approximately 10,800 kg, or 10.8 metric tons, and the total cargo

---

[3] A "safe working load," also called a "maximum rated load," "is the highest load permitted to be carried by the component." 73 Fed. Reg. at 75,254.

[4] One kilogram equals approximately 2.2 pounds. *Comm'r v. Shapiro*, 424 U.S. 614, 623 n.9 (1976). A newton is a unit of force equal to "the force that would give a mass of one kilogram[] an acceleration of one met[er] per second per second." X Oxford English Dictionary 378 (2d ed. 1989).

[5] A safety factor measures the difference between the safe working load of a unit and the ultimate strength of the unit. For example, a safety factor of three requires that the ultimate strength of the unit be three times greater than the unit's safe working load; *i.e.*, for the unit to have a safe working load of 100, its ultimate strength has to be at least 300. The purpose of the safety factor is "to guard against the possibility that the component is accidentally subjected to forces greater than it can bear." Resp'ts' Br. 20.

in a three-container VTL does not exceed approximately 6200 kg, or 6.2 metric tons.

On September 16, 2003, OSHA issued a notice of proposed rulemaking announcing its intention to regulate VTLs. Longshoring and Marine Terminals; Vertical Tandem Lifts, 68 Fed. Reg. 54,298. The proposed rule would have permitted VTLs of two containers with a total weight (including cargo) of 20 tons. *Id.* at 54,317. It would have prohibited platform containers with upright end frames from being lifted in a VTL unit but would have allowed empty platform containers with the end frames folded down to be lifted as a VTL unit. *Id.* It would have also imposed a wind speed restriction on VTL operations and would have required the employer to examine the interbox connectors before each use. *Id.*

After receiving comments and holding public hearings, OSHA published the final VTL Standard in 2008. 73 Fed. Reg. 75,246 (Dec. 10, 2008). Like the proposed rule, the Standard permits only two-container VTL lifts. Unlike the proposed rule, however, the Standard permits VTLs of empty containers only so that a two-container VTL can have a mass *at most* of approximately 9200 kg or 9.2 metric tons.[6] Further departing from the proposed rule, the final Standard categorically bans VTLs of platform containers. The Standard additionally requires "that interbox connectors and containers, including, in particular, their corner castings [connection points], . . . be inspected immediately before being used in a VTL" despite OSHA's acknowledgment that this requirement "may make ship-to-shore VTLs impractical." *Id.* at 75,278 & n.31. Finally, the Standard imposes a "safe work zone" requirement, which requires the employer to "establish a safe work zone within

[6] Thus, unlike the Standard, the ISO and ICHCA standards would permit a two-container VTL to carry up to approximately 10.8 metric tons of cargo.

which employees may not be present when vertically connected containers are in motion[] . . . sufficient to protect employees in the event that a container drops or overturns." 29 C.F.R. § 1917.71(k) to (k)(1). As discussed more fully below, OSHA also determined that "unregulated VTL operations" pose a "significant risk" to worker safety. 73 Fed. Reg. at 75,251.

NMSA petitioned for review of the Standard on February 6, 2009.

## II.

We address, in order, OSHA's finding of significant risk, the feasibility of the Standard and its "safe work zone" requirement. We then discuss—and reject—the NMSA's two remaining arguments. OSHA's determinations are conclusive if supported by substantial evidence in the record as a whole. 29 U.S.C. § 655(f); *Steel Joist Inst. v. OSHA*, 287 F.3d 1165, 1168 (D.C. Cir. 2002).

### A. Significant Risk

The OSH Act authorizes the Secretary of Labor[7] to "promulgate, modify, or revoke any occupational safety or health standard." 29 U.S.C. § 655(b). The Act defines an "occupational safety or health standard" as a standard "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* § 652(8). Before OSHA can enact any permanent health or safety standard, it must make "a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.* (*Benzene*), 448 U.S.

---

[7] The Secretary of Labor has delegated this authority to OSHA. 72 Fed. Reg. 31,160.

607, 642 (1980) (plurality opinion).[8] The requirement that OSHA make a threshold finding of significant risk imposes an important limitation on its regulatory authority, *see id.* at 646, but OSHA does not have to "calculate the exact probability of harm" or "support its finding . . . with anything approaching scientific certainty." *Id.* at 655-56. Nor must it "wait for deaths to occur before taking any action." *Id.* at 655. It "is free to use conservative assumptions" and to err "on the side of overprotection rather than underprotection." *Id.* at 656.

OSHA based its determination that VTLs pose a significant risk on four factors. First, OSHA considered "evidence of at least nine VTL separations in the United States and Canada over the past 15 years" which it believed "could have resulted in injury to or death of one or more employees" even though the separations did not cause any injuries. 73 Fed. Reg. at 75,251. Second, OSHA noted that the marine cargo handling industry has adopted its own standards for VTLs, which OSHA took as an industry acknowledgment that VTLs pose a significant risk. *Id.* Third, having previously determined the "handling" of a single container "to include risk," OSHA concluded that lifting multiple containers in a VTL "cannot be less risky." *Id.* Fourth, OSHA conducted an engineering analysis of the strength of the interbox connectors used in a VTL and found "that lifting loaded containers in a VTL or lifting more than two containers in a VTL poses a significant risk of failure." *Id.*

---

[8] Although *Benzene* commanded only a plurality of the Court, our reading of subsequent Supreme Court precedent is that a majority of the Court has adopted the significant risk requirement. *Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock*, 838 F.2d 1258, 1263 (D.C. Cir. 1988) (citing *Am. Textile Mfrs. Inst. v. Donovan* (*Cotton Dust*), 452 U.S. 490, 505-06 n.25 (1981)).

The engineering analysis needs explanation.[9] In calculating the "forces imposed on interbox connections during [a] VTL[]," OSHA followed the ICHCA methodology but used more restrictive assumptions. *Id.* at 75,260. First, whereas the ICHCA assumed the forces are spread across four fully engaged interbox connectors (one at each corner of the container), OSHA assumed that only two connectors on opposite (diagonal) corners carry the entire load. *Id.* at 75,260. OSHA based its assumption on testimony of longshoremen and container manufacturers that one or more interbox connectors can frequently detach (or not attach in the first place) and that it is difficult to detect such detachments if the two connectors on opposite corners remain attached. *Id.* at 75,256, 75,258, 75,260. OSHA concluded "that it is not uncommon" for a VTL to be performed with only the two connectors at opposite corners attached and therefore it sought to ensure that, using the "two diagonal connectors attached" assumption, a VTL could be performed safely. *Id.* at 75,258. Second, because the ICHCA did not account for the fact that a container being lifted and moved accelerates, putting additional force on the connectors, OSHA considered the

---

[9] OSHA began by determining the "maximum rated load"—or safe working load—of interbox connectors as well as an appropriate "safety factor." *See supra* notes 3, 5 (explaining safe working load and safety factor). OSHA adopted a safety factor of five, relying primarily on the ISO and ICHCA standards, which, as noted earlier, use a safety factor of five. 73 Fed. Reg. at 75,258. OSHA also relied on the ISO and ICHCA standards in adopting a safe working load of 10,000 kg, which is the equivalent of 98 kN of force (10,000 kg multiplied by 0.00980665 kN/kg). *Id.* at 75,257. To satisfy a safety factor of five with a safe working load of 98 kN, interbox connectors must have a minimum ultimate strength that allows them to withstand forces equal to 490 kN (98 kN multiplied by 5). *Id.* at 75,257 n.14.

additional force caused by up to 2.0 g[10] of acceleration that occurs during a VTL "to determine the baseline force on each of the two intact connections between the" containers. *Id.* at 75,260, 75,262.

The NMSA challenges OSHA's significant risk finding on two grounds. First, it asserts OSHA failed to take the necessary step of quantifying the risk VTLs pose to worker safety. Second, it argues that OSHA cannot rely on a finding that "unregulated VTL operations," *id.* at 75,251, pose a significant risk to worker safety but instead must determine that VTLs pose a significant risk to worker safety under current industry practice. We reject both challenges.

OSHA's determination that significant risk should be measured against the baseline of what current law requires amounts to an interpretation of what is "reasonably necessary or appropriate to provide safe or healthful employment." 29 U.S.C. § 652(8). By not allowing voluntary industry standards to preempt regulation, OSHA's interpretation furthers the Act's purpose of "building upon advances already made through employer and employee initiative." *Id.* § 651(b)(4). The NMSA does not cite, and we are not aware of, any case requiring OSHA to consider voluntary industry standards in determining the existence of a significant risk in a workplace. Because neither the OSH Act nor our precedent "unambiguously forecloses the agency's interpretation," we owe deference to OSHA's reasonable construction. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005); *see also Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Associated Builders & Contractors, Inc. v. Brock*, 862 F.2d 63, 68 (3d Cir. 1988) ("We reject . . . the

---

[10] "g" represents the acceleration due to gravity, approximately 9.8 meters per second per second ($m/s^2$) at sea level. VI Oxford English Dictionary 299 (2d ed. 1989).

contention . . . that because the construction industry already provides training in hazardous materials handling, there is no significant risk in that industry. At best that argument establishes the existence of risks . . . ."), *cert. denied*, 490 U.S. 1064-65 (1989), 494 U.S. 1003 (1990).

Nor is OSHA required to quantify a risk before determining that it is significant. We have previously noted the "peculiar problem of reviewing the rules of agencies like OSHA" that arises from "applying the substantial evidence test to regulations which are essentially legislative and rooted in inferences from complex scientific and factual data." *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1206-07 (D.C. Cir. 1980), *cert. denied*, 453 U.S. 913 (1981). In such a case, as this one is, our task is not to "second-guess an agency decision that falls within a zone of reasonableness" but rather to "ensure public accountability" by requiring the agency to identify the evidence upon which it relies, to explain its logic and the policies underlying its choices, to state candidly any assumptions on which it relies and to provide its reasons for rejecting contrary evidence and arguments. *Id.* (internal quotation marks omitted). OSHA has met that burden regarding its significant risk determination of VTLs.[11]

---

[11] Although we uphold OSHA's determination that VTLs pose a significant risk to worker safety, we think it important to note a flaw in the third factor upon which OSHA relied to support its significant risk determination, namely that a two-container VTL "cannot be less risky" than a one-container lift. 73 Fed. Reg. at 75,251. OSHA apparently failed to account for the reduced number of lifts required to be performed if VTLs are used. Because a VTL moves two containers, a ship can be loaded or unloaded with half as many lifts as it can be using single lifts. Even if a VTL is riskier than a one-container lift, it could still be safer to perform VTLs because of the smaller number of total lifts. Had OSHA relied on this factor alone, its significant risk determination might well have been arbitrary and

## B. Feasibility

The NMSA also challenges two discrete requirements of the VTL Standard—the interbox connector inspection requirement, 29 C.F.R. § 1917.71(i)(9),[12] and the ban on platform container

---

capricious. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). OSHA's engineering analysis and the evidence of past VTL separations are sufficient, however, to support its determination that VTLs pose a significant risk to worker safety.

[12] 29 C.F.R. § 1917.71(i)(9) provides:

The employer shall ensure that *each* container and *interbox connector* used in a VTL *and each corner casting* to which a connector will be coupled *is inspected immediately before use* in the VTL.

(i) Each employee performing the inspection shall be capable of detecting defects or weaknesses and be able to assess their importance in relation to the safety of VTL operations.

(ii) The inspection of each interbox connector shall include: a visual examination for obvious structural defects, such as cracks; a check of its physical operation to determine that the lock is fully functional with adequate spring tension on each head; and a check for excessive corrosion and deterioration.

(iii) The inspection of each container and each of its corner castings shall include: a visual examination for obvious structural defects, such as cracks; a check for excessive corrosion and deterioration; and a visual examination to ensure that the opening to which an interbox connector will be connected has not been enlarged, that the welds are in good condition, and that it is free from ice, mud or other debris.

VTLs, *id.* § 1917.71(i)(10)[13]—as technologically infeasible.

OSHA standards must be both economically and technologically feasible. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. OSHA*, 37 F.3d 665, 668 (D.C. Cir. 1994). "To establish technological feasibility, OSHA, after consulting the best available evidence, must prove a reasonable possibility that the typical firm will be able to develop and install engineering and work practice controls that can meet the [standard] in most of its operations." *Am. Iron & Steel Inst. v. OSHA*, 939 F.2d 975, 980 (D.C. Cir. 1991) (internal quotation marks omitted). We defer to OSHA's feasibility determination in pre-enforcement review but "the test for feasibility cannot be lamely deferential." *Id.* (internal quotation marks omitted). We conclude that the record lacks substantial evidence to support the feasibility of section 1917.71(i)(9) in part and of section 1917.71(i)(10) and, accordingly, that upholding the sections *in toto* would be lamely deferential.

The VTL Standard is almost devoid of a feasibility analysis. It contains only OSHA's bare conclusion that "[b]ecause all of the[] conditions [imposed by the Standard] can be met by

---

(iv) The employer shall establish a system to ensure that each defective or damaged interbox connector is removed from service.

(v) An interbox connector that has been found to be defective or damaged shall be removed from service and may not be used in VTL operations until repaired.

(vi) A container with a corner casting that exhibits any of the problems listed in paragraph (i)(9)(iii) of this section may not be lifted in a VTL. (emphases added).

[13] 29 C.F.R. § 1917.71(i)(10) provides: "No platform container may be lifted as part of a VTL unit."

stevedores, and in fact most are being met where VTLs are currently being performed, . . . the [Standard] is technologically feasible." 73 Fed. Reg. at 75,285. The NMSA disagrees with OSHA's assessment. It asserts that the inspection requirement "has resulted in a total ban of ship-to-shore VTLs" because "[i]t is neither safe, nor feasible, for employees" to inspect containers that are "in a stack between other containers sitting 80 feet above the ship's deck and twice that distance above the water and dock." Pet'r's Br. 34-35; *see also* Transcript of Informal Public Hearing for the Proposed Rule on Variable Tandem Lifts, at 100 (OSHA, July 30, 2004) (Joint Appendix 865) (testimony of Bill Williams, vice president for Maersk, Inc.) (requiring longshoremen to ascend containers stacked on ship can "expose[ them] to a fall hazard of 60 feet or more above deck"). Absent substantial evidence to support OSHA's determination that its inspection requirement is feasible for ship-to-shore VTLs, we cannot uphold that determination. As to shore-to-ship VTLs, however, the NMSA concedes that inspection before each VTL is feasible and that it is current industry practice to perform it. Oral Arg. 39:12-39:55. We therefore uphold OSHA's feasibility determination with regard to the inspection requirement for shore-to-ship VTLs.

The NMSA further alleges that the total ban on platform container VTLs can make it infeasible to unload cargo from a ship because platform containers are often stacked and interconnected overseas and thereafter cannot always be separated or chained together before lifting. *See* Curto Decl. ¶ 12 (Ex. A to Pet'r's Br.) (prohibition on platform container VTLs leaves marine terminal operators "no feasible option" for handling platform containers in many circumstances because containers "frequently cannot be accessed to separate or unitize for lifting in accordance with the VTL Standard"); Pet'r's Br. 33 ("Under many circumstances, it simply is not technologically feasible to access a set of platform containers that have been interconnected overseas and separate or chain them together

before lifting them."). If that occurs, a domestic marine terminal operator must either lift the platform containers as a unit—and thus violate the Standard—or leave the containers—and any containers beneath them—onboard. Curto Decl. ¶ 12. Because OSHA's proposed rule would have permitted VTLs of empty platform containers with their end panels folded, commenters had no notice of the Standard's total ban and therefore did not address the infeasibility of the ban. In light of the lack of record evidence regarding feasibility *vel non*, we cannot conclude that substantial evidence supports OSHA's feasibility determination with regard to the total ban on platform container VTLs.[14]

---

[14] OSHA protests that the NMSA's evidence supporting the infeasibility of the ban on platform container VTLs—the declaration of Joseph Curto, president of the New York Shipping Association, an "association of marine terminal operators, stevedores and ocean carriers handling and transporting cargo and passengers in the Port of New York and New Jersey," Curto Decl. ¶ 2—was submitted after the rulemaking ended and therefore comes too late for judicial review. *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997). The total ban, however, is a significant departure from OSHA's proposed rule, which would have permitted VTLs of platform containers with their end panels folded. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (parties may supplement administrative record if, *inter alia*, court "need[s] to supplement the record with background information in order to determine whether the agency considered all of the relevant factors" (internal quotation marks omitted)); *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) ("[W]e have refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities."); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) ("Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."). Because the

Accordingly, we vacate and remand the inspection requirement, 29 C.F.R. § 1917.71(i)(9), as applied to ship-to-shore VTLs, and the total ban on platform container VTLs, *id.* § 1917.71(i)(10).

### C. "Safe Work Zone" Requirement

The "safe work zone" requirement directs the employer to "establish a safe work zone within which employees may not be present when vertically connected containers are in motion." 29 C.F.R. § 1917.71(k). The safe work zone must be "sufficient to protect employees in the event that a container drops." *Id.* § 1917.71(k)(1). If an employer establishes a safe work zone as the Standard requires, the NMSA asserts, employees will not face any danger and the Standard's other requirements are therefore not "reasonably necessary or appropriate" to protect worker safety. 29 U.S.C. § 652(8). According to the NMSA, OSHA has a duty to explain why it did not simply "adopt the 'safe work zone' requirement without some or all of the other requirements in the VTL Standard." Pet'r's Br. 30. The NMSA further argues that, because employees are not at risk when an employer complies with the safe work zone requirement, OSHA lacks jurisdiction to impose additional requirements because no risk to employees remains. The NMSA is mistaken. While the safe work zone requirement adequately protects employees located on the ground, it does not necessarily protect the crane operator who moves the containers. If a container were to separate during a VTL, the separation could jar the crane and injure the operator. *See* 73 Fed. Reg. at 75,256 (testimony of union representative that container can "alligator" during VTL and "slam back down, jarring the crane cab operator"); *cf.*

---

administrative record lacks evidence regarding the feasibility of the total ban on platform container VTLs, the NMSA's evidence should be considered "in order to determine whether the agency considered all of the relevant factors." *Am. Wildlands*, 530 F.3d at 1002.

Transcript of Informal Public Meeting, "Piggyback" Container Issue at 248 (OSHA, Jan. 27, 1998) (Joint Appendix 345) (testimony of Matthew Laport, crane operator for Sea-Land) (describing as "a hell of a feeling" when interbox connector initially fails to disengage during single lift so that lifted container remains attached to container below and "everything just jolts" when connector finally releases). The safe work zone requirement, therefore, does not make the VTL Standard's other requirements unnecessary or inappropriate and we believe OSHA has supported the requirement with substantial evidence. *See* 73 Fed. Reg. at 75,256, 75,272.

### D. OSHA's Authority to Prohibit Workplace Practices

The NMSA takes issue with OSHA's statement in the VTL Standard that it "*permits* VTLs of no more than two empty containers." Pet'r's Br. 35 (emphasis in brief) (quoting 73 Fed. Reg. at 75,246). OSHA, according to the NMSA, lacks statutory authority to permit or ban workplace practices, arguing that OSHA can regulate only *how* workplace practices are performed, not *what* workplace practices are performed. OSHA's unquestioned authority to ensure safe workplace practices, however, includes the authority to prohibit unsafe practices. *See* 29 U.S.C. § 655(b) (authorizing OSHA to "promulgate, modify, or revoke any occupational safety or health standard"); *id.* § 652(8) (" '[O]ccupational safety and health standard' means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."). OSHA might be stymied in its responsibility to require certain practices if it could not also prohibit noncompliant practices.

### E. Non-Delegation Challenge

The United States Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." U.S. Const. art. I, § 1. The Constitution "permits no delegation of those powers, and so . . . when Congress confers decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) (emphasis in original) (internal citations, quotation marks and brackets omitted). In *Benzene*, the Supreme Court interpreted the OSH Act to require OSHA, before issuing a standard under the Act, to "determine that [the standard] is reasonably necessary and appropriate to remedy a significant risk of material health impairment." *Benzene*, 448 U.S. at 639 (plurality opinion). The limiting construction was necessary because a plurality of the Court believed that without the construction "the statute would make such a sweeping delegation of legislative power that it might be unconstitutional." *Id.* at 646 (internal quotation marks omitted). That the Court did not invalidate the Act manifests that the Court believes the Act, as interpreted in *Benzene*, contains an intelligible principle for promulgating health standards. But here the NMSA challenges, as an unconstitutional delegation of legislative power, the Act's grant of authority to issue safety standards. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. OSHA*, 938 F.2d 1310, 1316 (D.C. Cir. 1991).

The delegation of power to OSHA under the OSH Act to set health or safety standards that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8), is no broader than other delegations that direct agencies to act in the "public interest," *e.g., Nat'l Broad. Co. v. United States*, 319 U.S. 190, 215-16

(1943) (internal quotation marks omitted), or in a way that is "fair and equitable," *Yakus v. United States*, 321 U.S. 414, 420-23 (1944), or in a manner "requisite to protect the public health," *Whitman*, 531 U.S. at 472-76 (internal quotation marks omitted), or when "necessary to avoid an imminent hazard to the public safety," *Touby v. United States*, 500 U.S. 160, 163, 165 (1991) (internal quotation marks omitted). *See also Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946) (authorizing SEC to reorganize corporate structures to ensure they are not "unduly or unnecessarily complicate[d]" and do not "unfairly or inequitably distribute voting power among security holders" (internal quotation marks omitted)); *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30-31 (D.C. Cir. 2008) (authorization to obtain land "for Indians" contains intelligible principle), *cert. denied*, 129 S. Ct. 1002 (2009). *See generally Whitman*, 531 U.S. at 472-76. "In light of these precedents, one cannot plausibly argue that [29 U.S.C. § 652(8)'s "reasonably necessary or appropriate to provide safe or healthful employment and places of employment"] standard is not an intelligible principle." *Touby*, 500 U.S. at 165. Accordingly, we reject the NMSA's non-delegation challenge.

## III.

For the foregoing reasons, we deny the NMSA's petition for review in large part; we also grant the petition in part, vacating and remanding only that portion of the VTL Standard providing for the inspection requirement for ship-to-shore VTLs and the total ban on platform container VTLs.

*So ordered*.