# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 24, 2014          Decided October 24, 2014

No. 12-1228

NATIONAL OILSEED PROCESSORS ASSOCIATION, ET AL.,
PETITIONERS

v.

OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION, ET AL.,
RESPONDENTS

AMERICAN FEED INDUSTRY ASSOCIATION, ET AL.,
INTERVENORS

---

On Petition for Review of a Final Rule of the
Occupational Safety & Health Administration

---

*Donald C. McLean* argued the cause for petitioners and intervenor for petitioners. With him on the briefs were *Marc L. Fleischaker* and *Valerie N. Butera*. *Philip C. Olsson*, *Gary H. Baise*, and *Anson M. Keller Sr.* entered appearances.

*Louise M. Betts*, Attorney, Occupational Safety & Health Administration, argued the cause for respondents. On the briefs were *Joseph M. Woodward*, Associate Solicitor for Occupational Safety and Health, at the time the briefs were filed, *Ann Rosenthal*, Acting Associate Solicitor for Occupational Safety and Health, *Heather R. Phillips*, Counsel for Appellate Litigation, and *Edmund C. Baird*, Attorney. *Anne R. Ryder*,

Attorney, U.S. Department of Labor, entered an appearance.

*Randy S. Rabinowitz* and *Stephen A. Yokich* were on the brief for intervenors Change to Win, et al. in support of respondents. *Steven H. Wodka* entered an appearance.

Before: HENDERSON, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Rogers, *Circuit Judge*: Responding to international efforts to harmonize the requirements for identification and labeling of hazardous chemicals, the Occupational Safety and Health Administration ("OSHA") revised its Hazard Communication Standard in 2012. *See* Hazard Communication, 77 Fed. Reg. 17,574 (Mar. 26, 2012) ("Final Rule"). That standard requires employers across industries to develop a program for classifying the dangers of workplace chemicals and conveying those dangers to their employees. *See* 29 C.F.R. § 1910.1200. Petitioners (and intervenor for petitioners), whose members include numerous businesses that handle and process grain and other agricultural products, seek vacatur of the Final Rule as it applies to combustible dust. For the following reasons, we deny the petition for review.

## I.

The Occupational Safety and Health Act of 1970 authorizes the Secretary of Labor to promulgate workplace safety or health standards, 29 U.S.C. § 655(b), including prescribing the use of labels or other warnings "to insure that employees are apprised of all hazards to which they are exposed." *Id.* § 655(b)(7). Two longstanding OSHA standards and an ongoing rulemaking are relevant here.

The Hazard Communication Standard was promulgated in 1983 and initially applied only to manufacturers. *See* 48 Fed. Reg. 53,280 (Nov. 25, 1983) (codified at 29 C.F.R. § 1910.1200). In 1987, OSHA made the Standard applicable to all employers with employees exposed to hazardous chemicals in the workplace. *See* 52 Fed. Reg. 31,852 (Aug. 24, 1987). The Standard is designed to "address comprehensively the issue of classifying the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees." 29 C.F.R. § 1910.1200(a)(2). "Rather than attempting to identify every hazardous chemical, the [Hazard Communication Standard] 'places primary responsibility for determining which products are hazardous on the chemical manufacturer or importer.'" *Nat'l Ass'n of Mfrs. v. OSHA*, 485 F.3d 1201, 1202 (D.C. Cir. 2007) (quoting *United Steelworkers of Am., AFL-CIO-CLC v. Auchter*, 763 F.2d 728, 739 (3d Cir. 1985)). Manufacturers and importers must evaluate and classify each chemical they produce or import to determine whether it is a "hazardous chemical." *See* 29 C.F.R. §§ 1910.1200(c), (d). They must ensure that hazardous chemicals are labeled for downstream users and create material safety data sheets that explain the hazard and applicable safety procedures in detail. *Id.* §§ 1910.1200(f), (g). Employers must develop, implement, and maintain "a written hazard communication program" to inform employees about hazardous chemicals present in the workplace through labels and safety data sheets, and they must train employees on the detection of hazardous chemical releases, safe handling methods, and emergency procedures. *Id.* §§ 1910.1200(b)(1), (e), (h).

OSHA also promulgated a safety standard for grain handling in 1987. *See* Grain Handling Facilities, 52 Fed. Reg. 49,592 (Dec. 31, 1987) (codified at 29 C.F.R. § 1910.272) ("Grain Handling Standard"). It sets workplace "requirements

for the control of grain dust fires and explosions, and certain other safety hazards associated with grain handling facilities," and applies to "grain elevators, feed mills, flour mills, rice mills, dust pelletizing plants, dry corn mills, soybean flaking operations, and the dry grinding operations of soycake." 29 C.F.R. §§ 1910.272(a), (b)(1). Employers are to control "fugitive grain dust," which is defined as "combustible dust particles" of a certain size. *Id.* §§ 1910.272(c), (j).

In 2006, OSHA issued an advanced notice of proposed rulemaking requesting comments on revisions to the Hazard Communication Standard to implement the Globally Harmonized System. *See* 71 Fed. Reg. 53,617 (Sept. 12, 2006). This is a uniform international chemical labeling system, which OSHA had been involved in developing, adopted by the United Nations Committee of Experts on the Transport of Dangerous Goods and the Globally Harmonized System of Classification and Labelling of Chemicals, and endorsed by the Economic and Social Council of the United Nations. The Globally Harmonized System, unlike the Hazard Communication Standard, designates hazard classes (*e.g.*, carcinogens, explosives) and categories of specific hazards within most hazard classes, and provides standardized labels and safety data sheet formats for employers to use for each class and category of hazard.

In 2009, OSHA published a notice of proposed rulemaking stating it was considering modifying the Hazard Communication Standard to conform with the Globally Harmonized System. *See* 74 Fed. Reg. 50,280 (Sept. 30, 2009) ("NPRM"). As relevant, OSHA proposed to include combustible dust as an "unclassified hazard" subject to the Standard's general labeling, data sheet, and training requirements, even though the Globally Harmonized System had not yet classified or defined "combustible dust." OSHA proposed a definition for

"unclassified hazards" to ensure all hazards currently covered or hazards identified in the future were included in the scope of the revised Hazard Communication Standard "until such time as specific criteria for the effect are added to the [Globally Harmonized System] and subsequently adopted by OSHA." *Id.* at 50,282. OSHA inquired: "Will this approach provide sufficient interim coverage for hazards such as combustible dust?" *Id.* OSHA noted its "longstanding position" that the general obligation to determine whether chemicals were hazardous extended to "dusts known to be subject to deflagration and subsequent explosion, *i.e.*, combustible dusts." *Id.* at 50,395.

The Final Rule designated combustible dust as a "hazardous chemical," 77 Fed. Reg. at 17,704, by defining "hazardous chemical" as "any chemical which is classified as a physical hazard or a health hazard, a . . . combustible dust . . . , or hazard not otherwise classified." 29 C.F.R. § 1910.1200(c). OSHA did not include a definition of combustible dust in the Final Rule, but noted that it had "already provided considerable guidance on the nature and definition of combustible dust in a variety of materials," 77 Fed. Reg. at 17,704, referring specifically to OSHA, 3371-08, Hazard Communication Guidance for Combustible Dusts (2009) ("2009 Guidance"), and OSHA, CPL 03-00-008, Combustible Dust National Emphasis Program Directive (Mar. 11, 2008) ("National Emphasis Program"). 77 Fed. Reg. At 17,704. Acknowledging commenters had urged clarity through inclusion of a definition of combustible dust, OSHA noted the delay in the global effort to develop a definition and explained that it did not want to eliminate safeguards that long had been in place, highlighting its 1986 interpretation that the Hazard Communication Standard already covered combustible dusts as a flammable solid and an explosive hazard. *Id*. at 17,704-705.

OSHA provided further guidance in December 2013, advising that regulated parties should classify materials as combustible dust in light of any past experience of explosions involving their workplace materials and testing data, and if such information was unavailable, particle size or published information about similar materials. *See* Memorandum to Regional Administrators from Thomas Galassi, Director, Directorate of Enforcement Programs, *Classification of Combustible Dusts under the Revised Hazard Communication Standard* (Dec. 27, 2013) ("2013 Guidance"). When using particle size standards to determine whether a product constituted combustible dust, parties could use either of two particle sizes as well as other reliable methods of classification. *Id*.

Separate and apart from the Hazard Communication Standard rulemaking, in 2009 OSHA issued an advanced notice of proposed rulemaking on combustible dust, with the intent of creating a substantive standard that would address the hazards of combustible dust from a wide variety of materials, *see* Combustible Dust, 74 Fed. Reg. 54,334, 54,334-335 (Oct. 21, 2009). Although OSHA has received some comments, it has not yet issued a notice of proposed rulemaking.

**II.**

Petitioners challenge the Final Rule on procedural, statutory, and constitutional grounds. The Occupational Safety and Health Act incorporates the notice and opportunity requirements for general rulemaking of the Administrative Procedure Act, *see* 29 U.S.C. § 655(b)(2); 5 U.S.C. § 553(b)(3); Resp't's Br. 25, and adopts the substantial evidence test for judicial review, *see* 29 U.S.C. § 655(f). This court has acknowledged the difficulties of applying the substantial evidence test "to regulations which are essentially legislative

and rooted in inferences from complex scientific and factual data, and which often necessarily involve highly speculative projections of technological development in areas wholly lacking in scientific and economic certainty." *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1206-07 (D.C. Cir. 1980). The reviewing court's task, then, is to ensure the agency has acted within the scope of its authority, followed the statutory and regulatory procedures, explicated the bases of its decision, and adduced substantial evidence in the record to support its determinations. *Id.* at 1206. This includes "requiring the agency to identify relevant factual evidence, to explain the logic and the policies underlying any legislative choice, to state candidly any assumptions on which it relies, and to present its reasons for rejecting significant contrary evidence and argument." *Id.* at 1207 (citation and quotation omitted); *see also Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743, 751-52 (D.C. Cir. 2011). Although the "substantial evidence" standard demands more stringent review of OSHA rules than would the APA's arbitrary and capricious standard, *see AFL-CIO v. OSHA*, 965 F.2d 962, 970 (11th Cir. 1992); *Nat'l Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 728 (5th Cir. 1989); *AFL-CIO v. Marshall*, 617 F.2d 636, 649 (D.C. Cir. 1979), this court has cautioned, in view of an "'emerging consensus' of the Courts of Appeals," that the difference between the two standards should not be "exaggerate[d]." *United Steelworkers*, 647 F.2d at 1213 n.23 (citing *Pac. Legal Found. v. DOT*, 593 F.2d 1338, 1343 n.35 (D.C. Cir. 1979)). Petitioners' constitutional challenge is subject to *de novo* review. *C-SPAN v. FCC*, 545 F.3d 1051, 1054 (D.C. Cir. 2008); *Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1313 (D.C. Cir. 1988); *see also* 5 U.S.C. § 706(2)(B).

**A.**

Petitioners contend that they were not provided notice of and an opportunity to comment on the possible inclusion of combustible dust from grain in the Hazard Communication

Standard. The advanced notice did not mention that combustible dust might be regulated as a hazardous chemical, and the proposed rule, in discussing combustible dust, did not explicitly indicate that grain dust would be considered combustible dust. Further, petitioners maintain, although notice is adequate when an interested party could have reasonably anticipated the final rulemaking from the proposed rule, *see Nat'l Mining Ass'n v. MSHA*, 116 F.3d 520, 531 (D.C. Cir. 1997), the grain industry could not have anticipated that the Hazard Communication Standard revisions would address grain dust because grain dust has been regulated since 1987 by the Grain Handling Standard. Petitioners also maintain they lacked notice that the Final Rule would require their members to consider dangers from downstream uses (rather than the initial manufacturing of the product) and to provide downstream users with material safety data sheets and labeling for combustible dust.

The NPRM confirms that OSHA gave adequate notice that combustible dust would be regulated under the Hazard Communication Standard when it proposed treating combustible dust as an "unclassified hazard" subject to the Standard's requirements. Significantly, OSHA expressly requested and received comment on whether such treatment of combustible dust would be adequate. *See* NPRM, 74 Fed. Reg. at 50,282. Relevant as background to this question, OSHA issued interpretive letters in 1986 and 1987 confirming that the Standard covered agricultural products – including grain – presenting dust explosion hazards. More particularly, in 1994, OSHA rejected the grain industry's position that the Hazard Communication Standard should not cover grain dust. Citing evidence that grain dust presents physical and health hazards, OSHA responded that its "position . . . remain[ed] the same — grain dust meets the definition of a hazardous chemical under the [Hazard Communication Standard]." Hazard

Communication, 59 Fed. Reg. 6,126, 6,154 (Feb. 9, 1994). Grain elevators thus had the responsibility to develop a grain dust safety data sheet and provide it to the elevators' workers as well as downstream users. *See id.* at 6,154-155. Additionally, as referenced in the NPRM, OSHA's 2008 National Emphasis Program explicitly noted that the agricultural industry handles combustible dusts, *see* National Emphasis Program § I & apps. D-1, D-2, and the 2009 Guidance included flour and sugar as examples of products that could cause combustible dust explosions. While petitioners suggest that they had no reason to expect that grain would be considered a "hazardous chemical" because food products had long been exempted from the Hazard Communication Standard, *see* Pet'rs' Br. 9 (citing 29 C.F.R. § 1910.1200(b)(5)(iii)), they acknowledge that the Standard covers respiratory hazards posed by grain dust, *see id.* 22, 39-40, 45. Moreover, the exemption for food products is only a partial one. *See* 29 C.F.R. § 1910.1200(b)(5).

Petitioners still suggest that the Final Rule was not a logical outgrowth of the proposed rule, which they contend contemplated regulating only *inhalation* hazards from grain dusts, while the Final Rule included "combustible dust" as a hazardous chemical subject to all provisions of the Hazard Communication Standard. In their view, the Final Rule was "an unforeseeable change of course." Pet'rs' Br. 46. In fact, both the proposed and final rules subjected combustible dust to the Hazard Communication Standard requirements for labeling, use of safety data sheets, and training. *Compare* NPRM, 74 Fed. Reg. at 50,395, 50,441, 50,540, *with* Final Rule, 77 Fed. Reg. at 17,704, 17,883. The proposed rule also mentions that employers must consider the potential hazards from downstream uses of a chemical. *See* NPRM, 74 Fed. Reg. at 50,395. In citing a Chemical Safety Board report recommending that the Hazard Communication Standard be amended to address combustible dust as evidence that the regulated community was not on notice

that the Standard would apply to grain dust hazards, petitioners overlook that the report was referenced in the NPRM, 74 Fed. Reg. at 50,395, and so cannot be evidence that OSHA's treatment of combustible dust changed between the proposed rule and the Final Rule. Although the Final Rule does treat combustible dust as a specific category of hazard, *see* Final Rule, 77 Fed. Reg. at 17,703-705, rather than as an "unclassified hazard" as proposed, *see* NPRM, 74 Fed. Reg. at 50,390, OSHA indicated in the proposed rule that it was contemplating continuing to treat combustible dust as a hazardous chemical, *see id.* In any event, OSHA stated that its proposal "would require the chemicals posing unclassified hazards" – including combustible dust – "to be treated as hazardous chemicals under the rule." *Id.* Petitioners thus had express notice that combustible dust, however labeled, would be subject to the relevant requirements in the Final Rule.

**B.**

Petitioners also contend that OSHA's decision to forgo establishing a uniform definition for combustible dust in the Final Rule, and to incorporate a definition from its ongoing combustible dust enforcement program, was unreasonable and unsupported by substantial evidence, in violation of section 6(f) of the Act, 29 U.S.C. § 655(f). In petitioners' view, rather than regulate combustible dust under the Hazard Communication Standard, OSHA should have addressed combustible dust in the pending Combustible Dust rulemaking, because there is no clear, consistent definition of "combustible dust" and existing OSHA and private standards are inconsistent and have not been evaluated through rulemaking.

Contrary to petitioners' characterization of the rulemaking, OSHA neither failed to provide any definition of nor adopted a multiplicity of wide-ranging approaches to classifying combustible dust: OSHA pointed regulated entities to an

"operative definition" of combustible dust in the National Emphasis Program, and then noted that commenters had suggested that certain industry consensus standards provided "further guidance." Final Rule, 77 Fed. Reg. at 17,705. The various government and industry definitions of combustible dust are not as different as petitioners suggest: each definition, with varying phrasing, refers similarly to particles that may explode under certain conditions.[1] The main substantive difference between the standards is whether they rely on a maximum particle size and if so, what that size is. Additionally, the 1987 Grain Handling Standard defines "fugitive grain dust" by reference to "combustible dust," and, although referring to a particle size, does not further define combustible dust. *See* 29 C.F.R. § 1910.272(c) ("Fugitive grain dust means combustible dust particles . . . of such size as will pass through a U.S. Standard 40 mesh sieve (425 microns or less)."). Yet there is no indication that the grain industry has struggled to understand what "fugitive grain dust" means. Because preexisting OSHA definitions and voluntary standards reflect a general consensus

---

[1] *Compare, e.g.*, National Emphasis Program § VIII.B (defining combustible dust as "[a] combustible particulate solid that presents a fire or deflagration hazard when suspended in air or some other oxidizing medium over a range of concentrations, regardless of particle size or shape"), *with* Nat'l Fire Protection Ass'n, Standard for the Prevention of Fires and Dust Explosions in Agricultural and Food Processing Facilities § 3.3.1 (2013) (defining agricultural dust as "[a]ny finely divided solid agricultural material 420 microns or smaller in diameter . . . that presents a fire or explosion hazard when dispersed and ignited in air"), *and* Nat'l Fire Protection Ass'n, Standard for the Prevention of Fire and Dust Explosions from the Manufacturing, Processing, and Handling of Combustible Particulate Solids § 3.3.5 (2013) (defining combustible dust as "[a] finely divided combustible particulate solid that presents a flash fire hazard or explosion hazard when suspended in air or the process-specific oxidizing medium over a range of concentrations").

on the meaning of combustible dust, OSHA could reasonably conclude that it was unnecessary to articulate a single, uniform definition in the Final Rule.

In the Final Rule, OSHA explained that regulating combustible dust as a specific hazard, rather than as an "unclassified hazard" as originally proposed, was needed because of the urgency of the combustible dust hazards in workplaces: OSHA noted the "important nature of the issue, a number of public comments, and the need to provide clarity sooner than the United Nations Sub-committee will complete its work." Final Rule, 77 Fed. Reg. at 17,705. Responding to the suggestion that OSHA address combustible dust only in the separate and specific Combustible Dust rulemaking, OSHA noted that it had consistently viewed combustible dust as within the scope of the Hazard Communication Standard and that excluding combustible dust from the Standard's coverage would eliminate longstanding protections. "[G]iven ongoing activities in the [Combustible Dust] rulemaking, as well as in the UN Sub-committee," OSHA decided to provide an interim definition by reference to the National Emphasis Program. *See id.* OSHA explained as well that the Combustible Dust rulemaking and the Hazard Communication Standard serve separate functions: "The rulemaking on combustible dust is a much broader approach to the issue, and will likely establish methods to control and address such dusts in the workplace. The [Hazard Communication Standard] is an information transmittal standard." *Id.*

Given OSHA's conclusion that the industry had shown only minor disagreement on the meaning of combustible dust, and the importance it attributed to maintaining existing protection against combustible dust, there was substantial evidence and an adequate explanation in support of OSHA's decision to incorporate an interim definition and guidance until a more

precise definition is implemented in another rulemaking – even if that process takes several years. *See United Steelworkers*, 647 F.2d at 1207. To the extent petitioners object that OSHA guidance and voluntary industry standards have not been evaluated under the "best available evidence" as required by 29 U.S.C. § 655(b)(5), or undergone required feasibility analyses, absent elucidation or meaningful citation, by mentioning this claim only in a cursory manner, petitioners have forfeited it. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).

**C.**

Finally, petitioners contend that OSHA violated the Due Process Clause because the Final Rule, for lack of a definition of combustible dust, is unconstitutionally vague on its face. They maintain their members lack notice of whether and how they must comply, and are concerned that the lack of a clear definition will encourage discriminatory enforcement. *See* Pet'rs' Br. 55-59 (citing, *e.g.*, Flynn Decl. ¶¶ 6-7 (Feb. 10, 2014)). OSHA responds this claim is not ripe, and in any event, petitioners' facial vagueness claim fails on the merits.

The ripeness inquiry requires courts "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The "fitness" factor takes into account "whether the issue 'is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (quoting *Natural Res. Def. Council, Inc. v. EPA*, 22 F.3d 1125, 1133 (D.C. Cir. 1994)). OSHA disputes only the second element of the fitness inquiry, maintaining that the court could better evaluate the vagueness claim in the concrete setting of an enforcement action. Relying on *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

489, 497 (1982), and *Natural Resources Defense Council, Inc. v. EPA*, 194 F.3d 130, 138 (D.C. Cir. 1999) ("*NRDC*"), OSHA maintains that petitioners must – but cannot here – show that the law is incapable of any valid application. *See* Resp't's Br. 52. Further, OSHA maintains, petitioners have not established the requisite hardship.

We conclude petitioners' facial vagueness challenge is ripe for review. It presents a legal question where OSHA's relevant factual determinations are relatively undisputed and further factual development would not provide the court with a significantly richer record. *See Sabre, Inc. v. DOT*, 429 F.3d 1113, 1119-20 (D.C. Cir. 2005); *Vill. of Bensenville v. FAA*, 376 F.3d 1114, 1120 (D.C. Cir. 2004). Unlike the petitioner in *NRDC*, 194 F.3d at 138, petitioners contend that the failure of notice regarding grain dust renders the combustible dust provisions invalid in all their applications. *See* Pet'rs' Br. 56-58; Pet'rs' Reply Br. 19-21. Indeed, the Final Rule has already had an immediate impact on the grain industry's ability to make decisions, even if some provisions will not take effect until 2015. *See EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 72 n.12 (1980); *Abbott Labs.*, 387 U.S. at 153-54; *Reckitt Benckiser Inc. v. EPA*, 613 F.3d 1131, 1137-38 (D.C. Cir. 2010); *Sabre*, 429 F.3d at 1117, 1120. The training provisions in the Final Rule became effective in 2013. *See* 29 C.F.R. § 1910.1200(j)(1); Pet'rs' Br. 56. Faced with not knowing whether they were required to provide training by December 1, 2013, much less the measure to use to determine if their products could create combustible dust downstream, petitioners' members claim they incurred costs and administrative burdens to ensure compliance at the risk of potentially more costly enforcement and sanctions. *See, e.g.*, Gordon Decl. ¶ 8 (Feb. 11, 2014); Rowe Decl. ¶¶ 6-9 (Feb. 19, 2014). OSHA offers no plausible reasons why it has an institutional interest in postponing review beyond generally referring to its desire to

remain free from judicial interference until the effects of its rule have been felt in a concrete way, which has already occurred. Moreover, 29 U.S.C. § 655(f) expressly authorizes pre-enforcement review of OSHA standards, and because this provision imposes a sixty-day time limit, "[p]ostponing review . . . could burden [petitioners] by preventing [them] from bringing a [pre-enforcement] challenge at all," *Vill. of Bensenville*, 376 F.3d at 1120.

On the merits, petitioners' vagueness claim fails, however. The Final Rule satisfies Due Process because the term "combustible dust" is clear enough to provide fair warning of enforcement, and OSHA has provided additional guidance on how the revised Hazard Communication Standard will be enforced. "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (quoting *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)); *see also Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 174 (D.C. Cir. 2007). Contrary to petitioners' reading of the Final Rule and the 2013 Guidance, the relevant documents lay out reasonably consistent and clear instructions on how employers should determine whether products in their workplaces may pose a combustible dust hazard.

First, "combustible dust" is part of the definition of "fugitive grain dust" in the Grain Handling Standard yet is not further defined by that regulation, *see* 29 C.F.R. § 1910.272(c), and petitioners have not suggested that the term is vague in that context. Just as the Grain Handling Standard provides a clear "action level" by forbidding the accumulation of more than 1/8

inch of fugitive grain dust on surfaces, the Hazard Communication Standard provides clear action requirements, such as labeling and training; the obligations imposed when combustible dust is present do not affect the clarity of the term "combustible dust." Second, the Final Rule indicates that the National Emphasis Program provides an "operative definition" of "combustible dust." 77 Fed. Reg. at 17,705. That Program defines combustible dust as "[a] combustible particulate solid that presents a fire or deflagration hazard when suspended in air or some other oxidizing medium over a range of concentrations, regardless of particle size or shape." National Emphasis Program § VIII.B. The Emphasis Program describes the necessary criteria for evaluating the risk of an explosion and discusses various testing methods to assess combustibility. *See id.* § IX.E & app. E. The 2013 Guidance advises that previous incidents of explosion will be the best indication of a combustible dust hazard, but employers may use alternative classification methods depending on the available information from laboratory testing, published test results, or particle size, using either of two size standards. In other words, the employer may choose the method of classification: If test data are unavailable and an employer is classifying by particle size, there is an express particle size below which dust capable of burning should be deemed combustible, but an employer may use a more protective standard that would classify larger dust particles as combustible.

The combustible dust provisions in the Final Rule are, thus, not vague in all their applications. A grain elevator company that had previous experience with dust explosions would know that its products presumptively pose a combustible dust hazard, unless it had evidence that the explosion was due to abnormal or unforeseeable conditions. Employers looking to the 2013 Guidance would know that they should consider available laboratory test data, but if such data are unavailable, they may

rely on other methods. Indeed, the Guidance appears to be written so that any vagueness in the Final Rule should inure to the benefit, not the detriment, of regulated parties. Petitioners maintain, however, that the 2013 Guidance is excessively confusing because it "could easily be interpreted as instructing enforcement *now* for provisions of the Final Rule that do not go into effect until 2015 or 2016." Petr's' Br. 43. Even assuming the Guidance is unclear about when enforcement should commence, this would have no bearing on whether the definition of "combustible dust" is unconstitutionally vague.

With regard to petitioners' concern about possible discriminatory enforcement, the absence of clear criteria in the Final Rule for evaluating a party's chosen alternative methods is not fatal. The 2013 Guidance indicates that in many cases OSHA expects that previous experience, laboratory testing, and published test results will adequately allow employers to classify combustible dust hazards. OSHA has explained why petitioners overstate the importance of OSHA's recognition of two different particle size standards: It means only that when an employer has chosen to classify combustible dust hazards by particle size (which is not the preferred method when test data are available), they may use the more protective of the two standards if they wish. That employers can use alternative methods if those methods are reliable does not undermine the Guidance's clear priority of methods by which employers should classify combustible dust hazards. Although a particular employer might pursue an as-applied vagueness challenge in future enforcement proceedings, the combustible dust provision of the Final Rule is not void for vagueness on its face.

In a footnote to their reply brief, petitioners contend that the Final Rule affects their First Amendment rights by compelling them to communicate the hazards of combustible dust, and thus strict scrutiny applies. But the court generally declines to

consider an argument if a party buries it in a footnote and raises it in only a conclusory fashion, *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014), and on that basis we will not entertain petitioners' contention here.

Accordingly, we deny the petition for review.