Katsas, Circuit Judge, concurring in part and dissenting in part:
The Mine Safety and Health Administration promulgated a regulation requiring mine operators to (1) "examine each working place at least once each shift before miners begin work in that place" and (2) prepare a "record" describing "each condition found that may adversely affect the safety or health of miners."
*1288 Examinations of Working Places in Metal and Nonmetal Mines , 82 Fed. Reg. 7680, 7695 (Jan. 23, 2017) ( Mine Examinations I ). After further review, MSHA amended the regulation in two respects. Examinations of Working Places in Metal and Nonmetal Mines , 83 Fed. Reg. 15,055, 15,057-58 (Apr. 9, 2018) ( Mine Examinations II ). Operators now may conduct the examination "before work begins or as miners begin work," 30 C.F.R. § 56.18002(a)(1), and the recording requirement now applies only to adverse conditions that are "not corrected promptly," id . § 56.18002(b). I believe that MSHA adequately explained the second change but not the first.
The Federal Mine Safety and Health Act of 1977 contains what has been described as a no-less-protection rule: "No mandatory health or safety standard promulgated under this subchapter shall reduce the protection afforded miners by an existing mandatory health or safety standard." 30 U.S.C. § 811(a)(9). When amending safety regulations, MSHA must "state the basis for its conclusion that the rule has been satisfied." Nat'l Mining Ass'n v. MSHA , 116 F.3d 520, 536 (D.C. Cir. 1997) (per curiam). Our review of this determination is "highly deferential and presumes the validity of agency action." Id . (quotation marks omitted). So, we do not lightly reject MSHA's evaluation of the "net safety effects of a change in a regulation," id . at 542, or the "factual determinations underlying its decision," id . at 537.
I agree with my colleagues that, even under this deferential standard of review, MSHA failed to justify the amendment to the examination requirement. MSHA asserted that miners "will be notified" of adverse conditions "before they are potentially exposed," regardless of whether the examination is conducted before or as they begin work. Mine Examinations II , 83 Fed. Reg. at 15,058. But the regulation itself requires only that operators "promptly notify" miners of adverse "conditions found." 30 C.F.R. § 56.18002(a)(1). It does not guarantee that such conditions will be found before exposure-which hardly seems inevitable if the examination is conducted as miners begin work rather than before. Because MSHA did not explain how miners would be notified of hazards before exposure, its decision was arbitrary and capricious.
In this Court, MSHA advanced more developed and more plausible justifications for the amendment. Perhaps it would be safe to conduct the examination as work begins, if the inspector is always "just ahead" of the miners and warns them of hazards "in real time." Respondents' Br. at 14. Perhaps this would even improve safety, by minimizing "the risk that conditions will be so changed" between the examination and the beginning of work. Id . at 12. But MSHA did not assert these justifications during the 2018 rulemaking. True, it noted that mines have "dynamic work environments where conditions are always changing." Mine Examinations II , 83 Fed. Reg. at 15,057. But it did so only to urge a "best practice" of conducting examinations "throughout the shift," not to suggest that examinations conducted as work begins are as safe or safer than ones conducted before. See id. Of course, we cannot uphold the amendment based on rationales that MSHA first articulated in litigation, see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. , 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), but the agency remains free to consider them on remand.
Unlike my colleagues, I would uphold the amendment limiting the recording requirement to hazards that are not promptly corrected. MSHA's analysis of this amendment balanced three competing safety considerations. First, MSHA recognized that "recording all adverse conditions, even those that are corrected *1289 promptly, would be useful in identifying trends and areas that could benefit from an increased safety emphasis." Mine Examinations II , 83 Fed. Reg. at 15,059. But MSHA then identified two countervailing considerations. It reasoned that "a recording exception for adverse conditions that are corrected promptly ... encourages prompt correction of adverse conditions." Id . And it concluded that "requiring all adverse conditions [to] be recorded in the examination record would overwhelm the record with minor housekeeping issues." Id . The latter considerations are reasonable. Encouraging prompt correction of hazards would seem to have obvious safety benefits. Moreover, this Court has noted the risk of "information overload," Bldg. & Constr. Trades Dep't, AFL-CIO v. Brock , 838 F.2d 1258, 1277 (D.C. Cir. 1988) (quotation marks omitted), and other federal agencies have acted to prevent it, see, e.g. , Truth in Lending , 74 Fed. Reg. 5244, 5281 (Jan. 29, 2009) ; Federal Motor Vehicle Safety Standards ; Occupant Crash Protection , 58 Fed. Reg. 46,551, 46,554 (Sept. 2, 1993).
My colleagues object that the record lacks "any comparative analysis." Ante at 1285. But MSHA did compare the competing safety considerations. It concluded that the amended recording rule would produce "as much or more in safety benefits" by heightening incentives to correct hazards promptly, and that decluttering examination records would provide further safety benefits. Mine Examinations II , 83 Fed. Reg. at 15,059. My colleagues respond that MSHA's safety assessment was too "conclusory." Ante at 1286. National Mining indicates otherwise. There, we upheld various amendments to mine-safety regulations challenged as inconsistent with the no-less-protection rule. In four instances, MSHA's explanation was not materially different from the one at issue here.
First , we upheld an amendment permitting the use of electricity for vehicles to evacuate miners if a ventilation fan shuts down. Commenters objected that electricity would be dangerous in that circumstance, but MSHA asserted without elaboration that the amendment would facilitate evacuations. See Safety Standards for Underground Coal Mine Ventilation , 61 Fed. Reg. 9764, 9772 (Mar. 11, 1996) ( Ventilation Standards ). We accepted the assertion and thought ourselves "required to defer to the agency." 116 F.3d at 537. We explained: "In this case, the agency has determined that the safety benefit gained by rapid evacuation of miners outweighs the risk of ignition. We are poorly positioned to second-guess the agency on the balancing of these two concerns." Id .
Second , we upheld an amendment limiting pre-shift inspections to violations of rules presenting an immediate hazard to miners. MSHA asserted that narrowing the inspections would improve safety, because "look[ing] for violations that might become a hazard could distract examiners from their primary duties." Ventilation Standards , 61 Fed. Reg. at 9793. We accepted the explanation without plumbing the record for more. 116 F.3d at 540.
Third , we upheld an amendment permitting less frequent inspection of fans that use an automated monitoring system. MSHA asserted that the improved technology would "provide greater safety" on balance. Safety Standards for Underground Coal Mine Ventilation , 57 Fed. Reg. 20,868, 20,874 (May 15, 1992). Our response: "Where an evaluation is to be made of the net safety effects of a change in a regulation, the court properly defers to [MSHA's] evaluation." 116 F.3d at 542.
Fourth , we upheld an amendment that narrowed another inspection recording rule to exclude defects "corrected by the end of th[e] shift."
*1290 30 C.F.R. § 75.312(g)(1). Commenters objected that the amendment would reduce safety by eliminating information about "recurring problems that may lead to bigger problems." Ventilation Standards , 61 Fed. Reg. at 9772. MSHA disagreed and asserted that "no safety purpose is served by requiring examiners to record problems" that had been promptly corrected. Id. We upheld the amendment, once again based on "our deference to [MSHA's] determination of net effects." 116 F.3d at 543.
Given these holdings, we should accept MSHA's explanation in this case. The agency correctly understood the governing legal question-whether the amendment reduced health or safety protections for miners. It identified considerations reasonably bearing on that question. And it compared the competing considerations to make an explicit assessment of the "net safety effects of a change in a regulation." 116 F.3d at 542. As National Mining recognized, we are "poorly positioned to second-guess the agency on the balancing" of the relevant safety risks and benefits. Id. at 537.
My colleagues object that the petitioners in National Mining did not challenge "the adequacy of MSHA's explanation," but only the "factual determinations that the new standard provided miners with as much protection as the old standard." Ante at 1286. Our opinion did not suggest that distinction. Rather, it was framed as a review of MSHA's explanations: we held that MSHA must "state the basis for its conclusion that the [no-less-protection] rule has been satisfied;" then, we found "[i]n each case ... no grounds to conclude that the Secretary failed to engage in reasoned decisionmaking." 116 F.3d at 536. Moreover, there was no reason to distinguish between MSHA's explanation and its factfinding. For each challenged regulation, the agency identified safety benefits to the amended rule, acknowledged countervailing costs, and concluded that the benefits outweighed the costs. Those "factual determinations," as my colleagues describe them, were the agency's explanation of why each proposed amendment was consistent with the no-less-protection rule. And as shown above, they were neither different in kind from, nor more fully developed than, the determination made here by MSHA.
My colleagues further contend that MSHA failed to address "its own previous findings" regarding the 2017 recording rule. Ante at 1287. But MSHA did address its key prior finding. In 2017, MSHA concluded that "recording all adverse conditions, even those that are corrected immediately, will be useful as a means of identifying trends." Mine Examinations I , 82 Fed. Reg. at 7686. In assessing the 2018 amendment, MSHA recognized that benefit of the 2017 rule, but concluded that two competing safety considerations outweighed it. Mine Examinations II , 83 Fed. Reg. at 15,059. In that respect, the two analyses are consistent. In 2017, MSHA further stated: "a record that notes the adverse conditions prior to miners working in an area expedites the correction of these conditions notwithstanding the regularity in which the adverse conditions occur." Mine Examinations I , 82 Fed. Reg. at 7686. That statement addressed a suggestion to exclude from the recording requirement uncorrected hazards that were "regularly recurring." See id . In 2018, no further comment on this point was necessary, as there was no proposal to revisit the issue. In 2017, one commenter argued that excluding "immediately corrected" hazards from the recording requirement "would provide an incentive to immediately correct" them. Id . But MSHA did not respond to this point, let alone compare the safety benefits of that proposal to those *1291 of the rule adopted. See id . Nor did MSHA need to make such a comparison-between the 2017 rule and its eventual 2018 successor-in order to conclude that the 2017 rule was safer than its 1979 predecessor.
As for the two safety benefits noted by MSHA in 2018, my colleagues question whether the 2018 rule will incentivize mine operators to correct adverse conditions promptly, because other regulations already require them to do so. Ante at 1285. But there is nothing unreasonable about providing increased incentives for compliance, by reducing the recording obligations of operators who do comply.
Finally, my colleagues conclude that "the risk of inundating miners with information" does not "appear in the administrative record." Ante at 1286 n.3 (quotation marks omitted). I read the record differently. As MSHA recounted, some commenters warned that "requiring all adverse conditions [to] be recorded in the examination record would overwhelm the record with minor housekeeping issues." Mine Examinations II , 83 Fed. Reg. at 15,059. MSHA "agree[d] with these commenters and conclude[d] that requiring mine operators to record only those adverse conditions that are not corrected promptly is as protective as the January 2017 rule." Id . Moreover, the commenters' concern was a safety one. They explained that a cluttered record risked " 'alarm fatigue,' whereby too many warnings become background noise and no one really hears them." J.A. 911; see also J.A. 769. MSHA reasonably credited that concern here-just as, in National Mining , it reasonably credited the concern that an examination record filled with corrected hazards might "distract [mine operators] from the primary focus" of identifying ongoing safety risks. 116 F.3d at 539.
My colleagues note that MSHA adopted the relevant comments "in a paragraph regarding mine operator burdens." Ante at 1286 n.3. But the surrounding discussion does not change the fact that MSHA agreed with commenters who expressed concern that cluttering the examination record would harm miner safety. Moreover, MSHA adopted these comments to make a clear safety determination: "requiring mine operators to record only those adverse conditions that are not corrected promptly is as protective as the January 2017 rule."Mine Examinations II , 83 Fed. Reg. at 15,059. Under these circumstances, "the agency's path may reasonably be discerned," so we must "uphold the decision even if it is of less than ideal clarity." Press Commc'ns LLC v. FCC , 875 F.3d 1117, 1122 (D.C. Cir. 2017) (quotation marks omitted).
In sum, I believe that MSHA adequately explained why the 2018 amendment to the recording regulation is consistent with the no-less-protection rule. Because my colleagues conclude otherwise, I respectfully dissent from Part II.B of the Court's opinion.